MARTIN A. MUCKLEROY, ESQ.
Nevada Bar No. 009634
MUCKLEROY LUNT, LLC
6077 S. Fort Apache, Ste 140
Las Vegas, NV 89148
Phone: (702) 907-0097
Direct: (702) 534-6272
Fax: (702) 938-4065
martin@muckleroylunt.com

*Attorneys for Plaintiff*

(Additional Counsel on Signature Page)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| THEODURUS STROUS, derivatively on behalf of SCIO DIAMOND TECHNOLOGY CORP., <br><br> Plaintiff, <br><br> v. <br><br> BERNARD MCPHEELY, KARL LEAVERTON, GERALD MCGUIRE, and LEWIS SMOAK <br><br> Defendants, <br><br> and <br><br> SCIO DIAMOND TECHNOLOGY CORP., <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Plaintiff Theodurus Strous ("Plaintiff" or "Strous"), by and through his undersigned counsel, brings this derivative complaint for the benefit of nominal defendant Scio Diamond Technology Corp. ("Scio" or the "Company"), against Individual Defendants Bernard McPheely ("McPheely"), Karl Leaverton ("Leaverton"), Gerald McGuire ("McGuire") and Lewis Smoak ("Smoak") (collectively, the "Individual Defendants," and together with Scio, the "Defendants") for breaches of their non-exculpable fiduciary duties and other serious misconduct.[1]

Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Scio with the U.S. Securities and Exchange Commission ("SEC") and the State of Nevada, press releases, news reports, publicly available filings in lawsuits, and matters of public record.

## NATURE AND SUMMARY OF THE ACTION

1.      This stockholder derivative action is brought for the benefit of Scio, based on wrongdoing committed from at least June 2019 (and most likely prior to) through the present (the "Relevant Period") by the Individual Defendants, who are certain of Scio's current and/or former directors and officers. These breaches of fiduciary duty, including the duties of loyalty, care and candor occurred in the aftermath of the purported transaction described in greater detail below with Adamas One Corp. ("Adamas") where the Company purportedly sold all of its assets to Adamas

---

[1]  All four of the Individual Defendants McPheely, Leaverton, Smoak and McGuire are and were directors of the Company and McGuire served as the Company's Chief Executive Officer ("CEO") and currently serves as Adamas One Corp. CEO.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

and allegedly received cash and Adamas common stock in return ("Adamas Transaction"). Shareholder approval by Scio shareholders was required.

2.      Scio, a Nevada corporation, has developed technology to manufacture single-crystal, lab grown diamonds. According to its SEC filings, the Company has not conducted active production since October 2017. The ceasing of production in October 2017 was material information that was not disclosed publicly by the Individual Defendants until the Company's SEC filing on February 8, 2019, well over a year later. In fact, just 3 months earlier before the production shutdown in October 2017, on July 11, 2017, Defendant McGuire stated in a Company press release that: "We've made significant progress with our white diamonds recently, and I am excited by the rapid growth we've seen in the market. … Our customer base has recognized these improvements and are creating stunning gemstones from our rough. … Scio Diamond expects to ramp up production of white diamonds over the summer months."   Instead, by October 2017, the Company was in mothballs, according to an interview with its new owner, John Grdina, majority shareholder, officer and director of Adamas. The Company's stock was publicly traded under the ticker SCIO on the OTC Link, operated by OTC Markets, Inc.

3.      Scio has also failed to comply with Section 13(a) of the Securities Exchange Act of 1934 (the "Exchange Act'') and Rules 13a-1 and 13a-13 promulgated thereunder while its stock was registered with the SEC by not filing "an Annual Report on Form 10-K since July 14, 2016 for the period ended March 31, 2016 or periodic or quarterly reports on Form 10-Q for any fiscal period subsequent to its fiscal quarter ending December 31, 2016."[2] Pursuant to Section 12(j) of the Exchange Act (and at the request of the Individual Defendants), the SEC revoked the

---

[2] See *In the Matter of Scio Diamond Technology Corp., Respondent,* Administrative Proceeding File No. 3-19327, Order Instituting Proceedings pursuant to Section 12(j) of the Securities Exchange Act of 1934, Making Findings, and Revoking Registration of Securities dated August 9, 2019.

registration of Scio securities effective as of August 9, 2019. *Id*. According to Defendant McGuire, "[t]he deregistration has no impact on shareholders' ownership of Scio or their interests in the [Adamas Transaction]."

4. Despite not filing any audited financials subsequent to the Company's fiscal year ending March 31, 2016, in the Spring of 2017 the Company engaged a boutique New York investment banking firm, Wavecrest Securities, self-described on its website as providing capital raising, M&A advisory and corporate finance solutions. Over the next year, the Company supposedly held discussions concerning various strategic alternatives culminating in the Adamas Transaction. Adamas is a Nevada corporation.

5. On December 12, 2018, the Company filed a Form 8-K (Item 1.01: Entry into a Material Definitive Agreement) ("12/12/2018 Form 8-K") with the SEC reporting that it had entered into an Asset Purchase Agreement (the "Agreement") with Adamas dated November 30, 2018.

6. According to the 12/12/2018 Form 8-K, the Agreement called for Adamas to purchase all of Scio's assets for the following consideration: (i) satisfaction of Company secured debt in the amount of approximately $3.3 million over 18 months following consummation of the Agreement; (ii) issuance to the Company of 350,000 shares of Adamas common stock with a guaranteed minimum resale price of $2.00 per share to be used to settle the Company's unsecured debt; and (iii) issuance to the Company of 900,000 shares of Adamas common stock to be distributed to Scio shareholders upon liquidation of the Company.

7. The 12/12/2018 Form 8-K represented that the Agreement also provided that the Adamas common stock "will be registered with the Securities and Exchange Commission, pursuant to a Registration Rights Agreement entered into between the Company and Adamas, and

subject to lockup/leakout provisions which will allow the shareholders to sell such shares over the two-year period following closing, on a graduated basis." Consummation of the Agreement and distribution of the Adamas common stock were subject to a number of conditions, including approval by Scio shareholders. No further information was provided and neither the original formal Agreement, Registration Rights Agreement nor the lockup/leakout provisions were exhibits to the 12/12/2018 Form 8-K or any other public filing (except for the lockout/leakup provisions that do not appear to have been amended and were included in a later filing). Scio shareholders were told that additional information would be forthcoming "in connection with the shareholder meeting to be held to approve the transaction." The Agreement and Registration Rights Agreement have never been publicly disclosed.

8.      On February 8, 2019, the Individual Defendants caused the Company to file its Preliminary Proxy Statement ("02/08/2019 Preliminary Proxy Statement") with the SEC, informing shareholders that the Agreement had been amended dated January 31, 2019 (the "Amended Agreement"). The 02/08/2019 Preliminary Proxy Statement informed shareholders that a special meeting would be held on March 8, 2019, at the Company's corporate headquarters in order to consider and vote to approve the proposed Adamas Transaction. The 02/08/2019 Preliminary Proxy Statement informed shareholders that the Amended Agreement called for Adamas to pay the Company approximately $5.8 million in cash and Adamas common stock and that the Scio Board that consisted of six directors, four of whom are Individual Defendants, approved the amended Adamas Transaction. In addition, Defendant McGuire, ultimately became CEO of Adamas and based on information and belief is currently serving as its CEO.

9.      The terms of the Amended Agreement (and Amended Registration Rights Agreement) substantially changed to the detriment of the Company and its shareholders from the

original Agreement and Registration Rights Agreement. The 02/08/2019 Preliminary Proxy Statement disclosed that a portion of the cash proceeds being used to satisfy the Company's secured debt included payment to five directors and officers who the Company conceded "have an interest in this transaction that is different from the average shareholder." These officers and directors included all of the Individual Defendants. Further, instead of the 900,000 shares of Adamas common stock being distributed to shareholders as represented in the 12/12/2018 Form 8-K (and purportedly the Agreement) and that such shares would be registered with the SEC, the 02/08/2019 Preliminary Proxy Statement represented that the 900,000 shares received by Scio were to be held indefinitely in the Scio Board's discretion.

10.     As to the Amended Registration of Rights Agreement, the 02/08/2019 Preliminary Proxy Statement represented that Adamas was to file a registration statement for 300,000 shares within 90 days after request by Scio, a new registration statement for an additional 300,000 shares no less than 9 months after the first registration statement, and another new registration statement for 300,000 more shares no less than 15 months after the first registration statement. The 900,000 Adamas shares purported to represent 5.5% of Adamas common stock. Again, the Company represented that the Board approved the Amended Agreement and that after the Adamas Transaction closed "[t]he Board intends to consider all options available to the Company regarding its future business, including engaging in active business activities." The Amended Agreement remained subject to shareholder approval.

11.     Unbeknownst to the Company's shareholders, two Board members, Ben Wolkowitz and Bruce Likly had already resigned at the time the 02/08/2019 Preliminary Proxy Statement was publicly filed with the SEC. In fact, it was not until February 13, 2019, that the Company publicly filed a Form 8-K with the SEC informing shareholders that "on February 7,

2019, Scio Diamond Board of Directors formally acknowledges the resignations of Ben Wolkowitz and Bruce Likely from the Board …"

12.     Over three months went by with no communication from the Company and the Individual Defendants concerning the Amended Agreement with Adamas. On May 17, 2019, the Company filed its final Proxy Statement in connection with the Adamas Transaction (the "Proxy Statement").

13.     The Proxy Statement reiterated the same terms and conditions of the Adamas Transaction as set forth in the Amended Agreement and contained additional information about the Adamas Transaction, the Company and Adamas, and set June 7, 2019, as the date of the Special Meeting for the shareholder vote on the Adamas Transaction. Furthermore, it disclosed that each of the Individual Defendants had also purchased diamonds from the Company at purportedly fair market value.

14.     Two weeks after the Proxy Statement was filed with the SEC on May 31, 2019, the Company filed a Form 8-K with the SEC disclosing that it received a resignation letter on May 6, 2019, from Chief Financial Officer ("CFO"), Jonathan Pfohl ("Pfohl"). Although the Company received the Pfohl resignation letter on May 6, 2019, it waited until May 30, 2019, to make the announcement, just 7 days prior to the shareholder vote on the Adamas Transaction.

15.     The Special Meeting scheduled for June 7, 2019, came and went with no disclosure about the results of the shareholder vote and any further information about the Adamas Transaction from the Individual Defendants on behalf of the Company. In fact, the last communication with shareholders was the filing with the SEC on August 9, 2019, of the order revoking the registration of Scio's shares. Since then, there has been no information about the Company or communications by the Individual Defendants, whatsoever.  But the Individual Defendants who were directors of

the Company in June 2019 made up Scio's entire Board of Directors with Defendant McGuire also serving in the dual role of CEO.

16.     The Individual Defendants were not finished engaging in misconduct that harmed the Company. On November 25, 2020, the Company's former law firm that represented it in the Adamas Transaction sued the Company, docketed as *Best & Flanagan, LLP v. Scio Diamond Technology Corporation,* Case No. 27-CV-20-15599 (Dt. Ct. 4th Jud. Dist. Minn.), for breach of a settlement and security agreement. According to the *Best & Flanagan* Complaint, the Adamas Transaction closed in August 2019. This lawsuit, buried in Minnesota state court, was not widely disseminated and shareholders were never informed that the Adamas Transaction closed or that a lawsuit had been brought against the Company.

17.     The *Best & Flanagan* Complaint further alleged that prior to the Adamas Transaction, it was owed approximately $500,000 and that the firm had earned additional fees of $133,000 in connection with the Adamas Transaction. On November 1, 2019, the parties entered into a settlement agreement along with a security agreement securing the settlement amount of $133,000 in satisfaction of all outstanding amounts due and owing with a payment date of November 25, 2019. Unbeknownst to shareholders, the security agreement the Individual Defendants entered into on behalf of the Company included a secured interest over any security investments such as the 900,000 shares of Adamas stock. This has never been disclosed by the Individual Defendants to the Company's shareholders and damaged the Company, which held the 900,000 Adamas shares.

18.     This was not the end of the Individual Defendants' misconduct. In connection with the settlement and security agreement, the Individual Defendants caused the Company to pay Best & Flanagan $75,000 on December 10, 2019, leaving a balance of $58,000. The Individual

Defendants caused the Company to fail to answer or otherwise respond to the *Best & Flanagan* Complaint and ultimately after a telephonic hearing on January 8, 2021, at which Defendant McGuire, a non-attorney appeared on behalf of Scio, the Court entered a default judgment of $58,000 plus attorneys' fees and costs on January 27, 2021. The Individual Defendants caused the Company to satisfy the judgment for a total of $63,455.50 on June 11, 2021. The source of the Company's  funds used to satisfy the judgment is a mystery only the Individual Defendants can answer. After the Adamas Transaction purportedly closed in August 2019, the Company was left with little cash, some of which the Individual Defendants received, and used to satisfy the remaining secured debt, and 300,000 shares of Adamas having a minimum value of $600,000 to settle the unsecured debt. Following, the Company was left with only the 900,000 shares of Adamas stock (or should have been).

19.    A few months later on September 9, 2021, Adamas filed a Form D, Notice of Exempt Offering ("Exempt Offering"), which stated that $1.56 million of equity securities has already been sold. The failure of the Individual Defendants to exercise their fiduciary duties in a prompt manner and consistent with the Company's rights under the Amended Agreement have caused the value of the 900,000 Adamas to become diluted, thereby damaging the Company. Plaintiff and the other shareholders have been kept in the dark about the Individual Defendants' activities that have damaged the Company. Plaintiff seeks to remedy that wrongdoing.

20.    The Individual Defendants breached their fiduciary duties in numerous ways including, but not limited to those set forth herein at (i) – (xvi). For the very same reasons, demand is excused as futile as to all four of the Individual Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their actions in (i) knowingly or recklessly failing to inform shareholders the results of the shareholder vote on the

Adamas Transaction, shareholder approval of which was a prerequisite to consummation of the deal, (ii) failing to inform shareholders whether the Adamas Transaction ever closed, (iii) purportedly closing the transaction without any disclosure to shareholders, (iv) failing to disclose any information post-closing concerning the 900,000 shares of Adamas stock received as part of the Amended Agreement, (v) failing to inform shareholders how the Company's investment in the 900,000 shares of Adamas stock was performing, (vi) failing to inform shareholders whether the Individual Defendants ever requested Adamas take steps to register Adamas stock with the SEC as provided in the Amended Agreement and if they did not, the reasons for such a decision, (vii) failing to disclose whether the Individual Defendants' secured debt was ever satisfied; (viii) failing to disclose whether the unsecured debt was ever satisfied; (ix) failing to disclose any financial information to shareholders concerning Scio or Adamas post-closing of the Adamas Transaction, (x) having held no annual meeting as required by the Company's bylaws; (xi) knowingly and voluntarily having the Company's registration of its publicly traded shares with the SEC revoked; (xii) causing the Company's corporate status in Nevada to be revoked, (xiii) engaging in related party transactions by buying diamonds from the Company for their own use and purchasing notes secured by Company assets; (xiv) having made no attempt to contact shareholders after the Company's registration of its shares were revoked back in August 2019; (xv) causing the Company to have a default judgment entered against it and then paying over $60,000 to satisfy the default judgment without any disclosure to Company shareholders; and (xvi) failure to exercise its fiduciary duties by permitting the value of the 900,000 Adamas shares to be diluted by the Exempt Offering.

21.     The only Company shareholders to receive any consideration in the Adamas Transaction were the Individual Defendants who received cash to at least partially satisfy their

secured debt. As revealed by the Proxy Statement, even the Individual Defendants admit on behalf of the Company that the Board had interests in the Adamas Transaction different than the other shareholders because of the payment they received in connection with the secured debt. The public shareholders received nothing, and the Company purportedly received 900,000 shares of Adamas stock that was going to be registered with the SEC and publicly traded. The Individual Defendants also caused the Company to be sued by its former lawyers, have a default judgment entered against the Company and then caused the Company to satisfy the default judgment for over $60,000. Further, by not taking adequate steps to maximize the value of the 900,000 Adamas shares owned by the Company as demonstrated by the dilution caused by the Exempt Offering, the Individual Defendants breached their fiduciary duties. As such, the Individual Defendants have knowingly, recklessly and in bad faith breached their fiduciary duties to the Company and its shareholders.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity between Plaintiff and Defendants and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

23.     The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this court permissible under traditional notions of fair play and substantial justice. Further, the Individual Defendants misconduct has harmed Scio, a Nevada Corporation.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because nominal defendant Nevada is incorporated under Nevada state law and many of the acts and practices complained of herein occurred in this District.

25.     Further, Sections 10.10(a) and 10.10(b) of the Amended Agreement have express

choice of law and forum clauses, respectively, mandating application of Nevada law, and personal jurisdiction and venue in Nevada in any action "arising out of or based upon" the Amended Agreement and the rest of the transaction documents.

## PARTIES

**Plaintiff**

26.      Plaintiff is a current stockholder of Scio common stock and has continuously held Scio common stock since prior to 2014. Plaintiff is a citizen and resident of a foreign country, Portugal.

**Nominal Defendant**

27.      Nominal Defendant Scio is a Nevada corporation which maintains its corporate headquarters at 411 University Ridge, Greenville, SC 29601, Currently, Adamas also lists its corporate headquarters at 411 University Ridge, Greenville, SC 29601. According to its public filings, Scio creates high quality, single-crystal, lab-grown diamonds in a variety of types and colors, including Type IIa diamonds that are finished for fine jewelry or diamond materials that are sliced and shaped for industrial applications. The Company has developed proprietary technology through which high-quality, Type IIa, single-crystal diamond materials are produced using a chemical vapor deposition ("CVD") process (the "Diamond Technology"). The Company's primary mission is to become the worldwide leader in the production and sale of high-quality manufactured gemstones.

**Individual Defendants**

28.      Defendant McPheely serves as non-executive chairman of the Board and has served in that capacity since June 23, 2014. In 2012, McPheely retired as President of Hartness International after more than 35 years of service. From 2000-2002 he was chairman of PMMI and as of 2016 was still on the Board of Directors of Dorner Manufacturing Corp. McPheely is a

graduate of the Thunderbird Graduate School of International Management and received his undergraduate degree from Albion College. Upon information and belief, Defendant McPheely is a citizen of South Carolina.

29. Defendant Leaverton serves as non-executive director of the Board and has served in that capacity since June 23, 2014. From 2003 through the present, he has been a Managing Member, Principal of Blakely Management Company. Serves on the Board of Directors of Awesome Financial Future from 2013 through the present. From 2008 through the present, Leaverton has served as Managing Member of YJ Aviation LLC. He was Chairman of the Board of 7mb Technologies Inc. from October 2013 through January 2018. From October 2010 through October 2017, Leaverton was a Partner of Hollywood Hill Vineyards. He was Chairman of SNW Asset Management LLC from July 2013 through April 2017. Leaverton served as President and CEO of Seattle-Northwest Securities Corporation from April 2012 to July 2013. From 2005 through 2012 he was a Member at CZI Aviation Management, LLC. He also was Regional Director at RBC Wealth Management from 1993 through 2009. From 2006 through 2009, he was President, Private Client Group, RBC Wealth management, at which time he was terminated. According to Mr. Leaverton's LinkedIn profile, he does not even disclose his directorship at Scio or any association with the Company at all. He earned a BS in Chemical Environmental Science from the University of Puget Sound and completed the course work for a BA in Economics. He earned a Master of Science degree in Infrastructure Management from Stanford University. Upon information and belief, Defendant Leaverton is a citizen of Washington.

30. Defendant Smoak serves as a non-executive director of the Board of the Company and has served in that capacity since June 23, 2014. Smoak is a founding partner of the law firm Ogletree, Deakins, Nash, Smoak & Stewart and has served on several boards including as

Chairman for Supermarket Radio Network; Zumar, LLC; and Consumer Transparency, LLC. Upon information and belief, Defendant Smoak is a citizen of South Carolina.

31.     Defendant McGuire has served as the Company's President, Chief Executive Officer and a director of the Company since July 11, 2014. McGuire's experience is in the semiconductor industry, and he served as Sr. VP and GM of the Low-Voltage and Mid Power Analog Business Unit at Fairchild Semiconductor from 2010 to 2013. Prior, he was employed for 23 years at Analog Devices in various roles and from 2007 to 2010 was VP/GM of Analog Devices Digital Signal Processing business. Defendant McGuire is currently serving as Adamas CEO. Upon information and belief, Defendant McGuire is a citizen of South Carolina.

## **RELEVANT NON-PARTIES**

32.     Bruce Likly ("Likly") is a former director of the Company from June 23, 2014, until his resignation on February 7, 2019. He served as non-executive vice-chairman of the Board. Likly has more than 25 years of technology, communication and management experience. He started his career at IBM and helped grow Sun Microsystems. Likely also acted as Principal at Kovak-Likely Communications, a company that helps other companies develop and implement strategic sales, marketing and communications plans.

33.     Adamas was incorporated in Nevada on September 6, 2018, for the purpose of acquiring existing technology to seek to efficiently and effectively produce man-made socially and Eco-friendly diamonds. Adamas' stated activities were to center on the acquisition of patented Diamond Technology that can be used to produce finished diamonds for retail jewelry, rough unfinished diamond materials for wholesale and industrial use. At the time of the Proxy Statement, Adamas represented that it was in the initial phase of purchasing and commercializing the Diamond Technology and its goal is to become a preferred manufacturer of single crystal diamond and a leading global supplier of diamond materials for multiple applications. Adamas hoped to

further shape the evolution of various markets for products and to leverage the technical foundation of the Diamond Technology by expanding into strategic partnerships with select industry leaders with distribution channels already in place to capture high value application opportunities.

34.     John ("Jay") Grdina ("Grdina") was the sole officer and director of Adamas. Prior to founding Adamas, Grdina was the founder of AMMO, Inc. (OTCQB: POWW), a publicly traded and SEC reporting issuer, where he served from 2016- 2019. From 2012 through 2015 he was a director and executive officer of NOHO, Inc., a publicly traded and SEC reporting issuer. Grdina was the founder and former CEO of Club Jenna, Inc., which was sold to Playboy Enterprises in 2006. While at Playboy Enterprises from 2006 to 2009, he was a Senior Vice President and the President of Production at Playboy responsible for all aspects of Television and Video Production. After serving as a Senior Vice President for Playboy, he went on to create the celebrity blogging sensations TheDirty.com and Kikster.com. Grdina has a checkered past and a long history with law enforcement and regulatory agencies over the last 30 years.

35.     Wavecrest Securities, LLC ("Wavecrest') provides investment banking services. The Company specializes in capital raising, mergers and acquisitions, financial analytics, and restructuring advisory services. It was incorporated in 2011 and is located at 830 3rd Avenue, New York, NY 10022. Wavecrest acted as the "boutique investment banking firm" that the Individual Defendants caused Scio to use to pursue strategic alternatives, ultimately resulting in the transaction with Adamas.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

36.     Each Individual Defendant, by virtue of his/her position as a director and/or officer, owed to Scio and to its stockholders the fiduciary duties of loyalty, candor and care.  The Individual Defendants were, and are, required to act in furtherance of the best interests of Scio and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal

interests or benefit.

37.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Scio, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Scio, each Individual Defendant had knowledge of material non-public information regarding the Company and failed to disclose that information to its own shareholders and the investing marketplace.

38.     To discharge their duties, the officers and directors of Scio were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Scio were required to, among other things:

    a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.  Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    c.  Exercise good faith in supervising and ensuring the timely preparation, filing, and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

d.  Refrain from unduly benefitting themselves and other Company insiders at the expense of the Company;

e.  Exercise good faith to ensure that the Company's communications with the public and with stockholders are made with due candor in a timely and complete fashion; and

f.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

39.  The Company also has by-laws, a Code of Conduct and corporate governance guidelines, all of which impact the duties and responsibilities of Scio's officers and directors including the Individual Defendants. The Code of Conduct states in pertinent part:

### CODE OF CONDUCT

**Expectations**
Our Code of Conduct serves as an active reference, describing how we expect our employees, Board members, partners and business associates to conduct themselves in doing business for or with Scio Diamond Technology Corporation (Scio Diamond). …


**Making Ethical Decisions**
We all take pride in our work and in the choices we make on behalf of Scio Diamond. These choices may be more difficult to make when we encounter ethical challenges. Our Code helps us recognize and resolve these challenges. When faced with a difficult ethical decision, ask yourself the following questions to determine whether the action you are contemplating is appropriate:

• Am I adhering to the letter and spirit of our Company's policies and all applicable laws and regulations?
• Is my action consistent with Scio Diamond's values and the principles set forth in our Code?
• Would I be acting in the best interests of Scio Diamond, my coworkers and our customers?
• What would my family, friends or neighbors think of my action?
• Would I want my action reported on the front page of a newspaper or on the Internet? …

**Following Our Code**

We take the guidelines in our Code seriously and strive to follow them conscientiously at all times. Please note that violations of the law, Scio Diamond policy or our Code may lead to disciplinary action, up to and including termination. In addition, such violations may result in civil or criminal consequences for both the persons involved and Scio Diamond. …

**Accurate Records**

When it comes to preparing Scio Diamond's corporate records, honesty and transparency are our guides. Each of us has a responsibility to ensure that the information contained in all of our business records — including our time cards, expense reports, sales records, purchase orders and production records — is full, fair, accurate, timely and understandable. We accomplish this by only providing information that is completed in accordance with our internal control procedures. If you are unsure how to represent information in a Scio Diamond report or document, refer to the Employee Handbook or contact your manager, CEO or CFO.

Our commitment to acting ethically and honestly requires that we engage in legitimate and authorized business transactions. We may never make a false representation on behalf of Scio Diamond, whether verbally or in writing. In addition, we must not hide Scio Diamond funds, mischaracterize Company transactions, create unrecorded fund accounts or knowingly allow similar illegal activities to occur. …

**Records Retention**

Properly creating, maintaining and destroying records are important aspects of keeping accurate business records. We must retain all Scio Diamond records in conformity with the guidelines set forth in our records retention schedules, as well as U.S. and local laws. These records retention schedules dictate the length of time companies must keep business records, as well as the way in which these records are to be destroyed.

If you are notified by a Company lawyer that you possess records relevant to anticipated or pending litigation, an investigation or audit, follow the guidelines set forth in that notification. Do not destroy, alter or conceal any covered documents (including computer files, e-mails and disks) in response to or in anticipation of any such Company notification, government proceeding or lawsuit. …

**What is a Conflict of Interest?**

A conflict of interest occurs when personal interests interfere with, or appear to interfere with, our ability to make objective judgments in the best interest of Scio Diamond. Avoiding actual or apparent conflicts of interest creates and sustains the trust of our customers and other business partners, our fellow employees and the public, so it is critical for all of us to be vigilant in this area. While it is impossible to address every situation where a conflict of interest may arise, the following sections address the most common scenarios.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**Personal Gain from Corporate Opportunities**

During the course of our employment at Scio Diamond, we may learn about business opportunities in which we are personally interested. We may not pursue or direct a third party to pursue any opportunity we learn about in connection with our employment or through the use of Company property or information, unless we have obtained written approval from the Company Legal department.

**Doing Business with Family Members**

We must be cautious when one of our immediate family members works for a company with which Scio Diamond does or intends to do business. If you find yourself in such a situation and your job involves making business decisions in relation to that company, you must disclose the situation immediately to your manager, your supervisor, or the Company Legal department.

**Investing in Outside Businesses**

A conflict of interest may arise if you or a family member holds a financial interest in a privately owned enterprise with which Scio Diamond does business or competes. The potential for a conflict of interest in this situation generally depends on the size of your investment, your role at Scio Diamond and the business relationship between Scio Diamond and the other company. You must obtain prior written approval from the Company Legal department before making such an investment.

**Outside Employment**

We must be careful to ensure that our outside interests and activities do not conflict with our obligations to Scio Diamond. Since outside employment may make us appear biased or harm our ability to make decisions in the best interest of Scio Diamond, we may not be employed by, work as a consultant for, or be affiliated with a Scio Diamond competitor, customer or supplier without prior written approval from the Company Human Resources department and Legal department.

**Securities Trading**

During the course of our employment at Scio Diamond, we may come to know information about our Company or our business partners before it is disclosed to the public. This information is often called "inside" or "material, nonpublic" information. According to securities laws, information is considered "material" if it would influence an investor to buy, sell or hold the securities of the company about which the information relates. Information is "nonpublic" until it has been publicly disclosed and a sufficient amount of time has passed for the securities market to absorb the information.

Because we work for a U.S. company that is publicly traded, we are obligated to understand and comply with the laws that relate to the use of inside information. In general, these laws state that we may not buy or sell a company's stock if we hold inside information about that company. This practice, which is known as "insider trading," violates both our Code and the law. Some common examples of "inside"

information may include discussions of mergers and acquisitions; changes in a company's senior management or executive structure; or sensitive corporate financial information.

We are also prohibited from "tipping" or sharing such information with a family member or friend who then buys or sells a security based upon that information. In such a situation, the person disclosing the information may be liable for violating securities laws, even if he or she did not personally make a trade.

In addition, the Board of Directors, Company Officers and any employees in possession of non-public information will strictly adhere to any trading "blackout" window as published by the CFO.

**Fraud and Theft**
By working for Scio Diamond, we have made a commitment to each other, our Company and our shareholders to protect and use our Company's assets appropriately and for business purposes. Such assets include physical property, intellectual property, information technology and our Company's reputation. Scio Diamond will promptly investigate, and where appropriate, prosecute reported incidents of fraud or theft of its assets. You should promptly report any suspected theft, loss or abuse of Company assets to your manager or supervisor, or InnovateHR or Legal Counsel.

**Physical Assets**
We all work hard to create and manage our Company's physical assets. These assets include Scio Diamond's products, money, facilities, vehicles and equipment. We must safeguard this highly valuable property and protect it at all times. We each have a personal responsibility to ensure that we use our Company's assets only to promote Scio Diamond's business interests.

**Intellectual Property**
Scio Diamond's intellectual property is at least as valuable as our physical assets, if not more so, and we must protect it carefully. Intellectual property (or "IP") includes patents, trademarks, copyrights and trade secrets, as well as technical data and software developed under or used in support of customer contracts.

In general, Scio Diamond retains exclusive ownership of the IP in any idea, process, trademark, invention or improvement we conceive in relation to our work with our Company. Our obligation to protect intellectual property continues even after our employment ends. A "trade secret" is information that generally is not known or reasonably ascertainable by the public and gives Scio Diamond a competitive advantage. …

**Statements to the Media and Investment Analysts**
It is important for Scio Diamond to provide the public with accurate and consistent information regarding our operations. We may only make public statements

regarding issues or matters for which we are authorized spokespersons. If a member of the media contacts you about a Scio Diamond matter, refer him or her to either the Director of Public Relations or the Chief Executive Officer. If an analyst approaches you, you should refer him or her to either the Director of Investor Relations, the Chief Financial Officer or the Chief Executive Officer.

40.     The Company's Amended and Restated Bylaws (the "Bylaws") call for an annual meeting and that the business and affairs of the Company shall be managed by its Board of Directors.

41.     The Company also has Corporate Governance Guidelines which are intended to provide a structure within which the Company's directors and management can pursue Scio's objectives for the benefit of its stockholders. The Guidelines also provide that the Board serves as the ultimate decision-making body of the Company, with a few exceptions, and selects and oversees senior management who is charged with running the day-to-day operations of the Company. The Board also has responsibility to monitor and manage potential conflicts of interest and to ensure the integrity of financial information. The Code of Conduct, Bylaws, and Corporate Governance Guidelines were all adopted by the Individual Defendants, who made up a majority of the Board. As described below, the Individual Defendants have violated numerous provisions of the duties and responsibilities mandated to be followed by the Board.

## **BACKGROUND**

42.     Led by Defendant McPheely, the Individual Defendants (other than Defendant McGuire who was already CEO), took control of the Company in mid-2014 in a proxy fight. McPheely dubbed the campaign to "Save Scio." During their tenure, the Company has gone from a publicly traded company that timely filed its quarterly and annual reports with the SEC, kept its corporate status in Nevada current and had ownership of valuable intellectual property with a prior market capitalization of approximately $50 million, to one that secretly ceased production in October 2017, had the registration of its shares revoked by the SEC in 2019 for failing to timely

file its periodic reports as required by law, had its corporate status in Nevada revoked, sold off all of its assets including its valuable intellectual property and is now worth virtually nothing, but for the 900,000 Adamas shares held by the Company that have been diluted by the Individual Defendants breach of fiduciary duties, and was sued by its own law firm and had a default judgment entered against it.

43.     With the Company's financial condition and performance deteriorating because of the actions of the Individual Defendants, according to the Proxy Statement and at the direction of the Board, Scio management formally began considering strategic alternatives in the Spring of 2017. As represented in the Proxy Statement, at that time Scio engaged a boutique NY investment banking firm, Wavecrest, who had aided the Individual Defendants in the Save Scio campaign and whose principals owned shares of Scio stock. Wavecrest allegedly helped Scio develop and shop a special investment vehicle and consider various license agreements. As set forth in the Proxy Statement, through Wavecrest, the Company had introductory discussions with purportedly 14 companies in the diamond industry. The investment structure, a Special Purpose Vehicle, SPV, was designed to raise $1.7 million in 15 units, to provide working capital for the Company. Participants in the SPV would receive discounted and a guaranteed supply of lab-grown diamonds. The Proxy Statement indicated that two of the discussions advanced, but ultimately did not result in an agreement.

44.     According to the Proxy Statement, in the fall of 2017, Scio also considered a strategic licensing deal with a diamond producer, but ultimately decided that the licensing would not provide the necessary capital for the Company's plans. Throughout the fall of 2017 and early 2018, the Company also considered debt restructuring. The Company entertained proposals from at least 3 groups, groups who proposed our equipment and IP as security. Unfortunately, the

Company could not find a solution which would both replace its secured lenders and provide the necessary working capital.

45.     Scio continued evaluating potential strategic options. The Proxy Statement represented that during late 2017 and 2018, Scio had serious discussions with 6 different groups. Three of these six groups performed some level of due diligence of Scio. One group was an investment group with extensive experience in advanced crystalline materials, ultimately, they were unable to raise capital to execute a deal. The proposed terms were $5.5 million in cash and capped royalties for sales of Scio's proprietary growers.

46.     According to the Proxy Statement, the second group was a public company involved in advanced materials. After discussions of IP strategies and the industrial market, it was represented that the public company was not able to put in a timely offer. According to the Proxy Statement, the third group, Adamas, is an investment group with experience in turning around distressed companies. On November 30, 2018, Scio's Board, a majority of which consisted of the Individual Defendants, approved the deal with Adamas, and the definitive agreements were returned executed on December 5, 2018. The Amended Agreement and ancillary documents were entered into effective January 31, 2019.

**THE ADAMAS TRANSACTION**

47.     On December 11, 2018, the Individual Defendants caused the Company to file a Form 8-K announcing a proposed transaction with Adamas whereby Adamas would purchase all of Scio's assets, including the intellectual property, in exchange for cash and stock valued at $5.8 million. With regard to the transaction, the Form 8-K stated:

> 1.01.     Entry into a Material Definitive Agreement.
> The Company has entered into an Asset Purchase Agreement, dated as of November 30, 2018, with Adamas One Corp., a Nevada corporation ("Adamas"), pursuant to which Adamas has agreed to purchase all of the assets of the Company in exchange for the following consideration:

22
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1.      Satisfaction of all outstanding secured debt of the Company in the total amount of approximately $3.3 million over the eighteen (18) months following closing.

2.      Issuance to the Company of 350,000 shares of Adamas common stock, with a guaranteed minimum resale price for the Company of $2.00 per share, to be used to settle unsecured debt of the Company in excess of $3,000,000.

3.      Issuance to the Company of 900,000 of Adamas common stock to be distributed to shareholders of the Company upon liquidation of the Company. The shares will be registered with the Securities and Exchange Commission, pursuant to a Registration Rights Agreement entered into between the Company and Adamas, and subject to lockup/leakout provisions which will allow the shareholders to sell such shares over the two year period following closing, on a graduated basis.

Consummation of the transaction, and distribution of the Adamas common stock, are subject to satisfaction of numerous conditions, including, but not limited to, shareholder approval by the Company, filing and effectiveness of a registration statement for the Adamas shares to be distributed to Company shareholders and other conditions. The Company will be providing additional information in connection with the shareholder meeting to be held to approve the transaction.

The Form 8-K was signed by Defendant McGuire on December 10, 2018.

48.      The Agreement provided for all of the Company's secured debt to be paid from the cash portion of the transaction with 350,000 shares converted into at a minimum $2.00 per share (or $700,000) to be used to settle the unsecured debt and 900,000 shares of Adamas stock to be distributed to Scio shareholders. Conditions to consummation of the transaction included, but not limited to, Scio shareholder approval and the filing and effectiveness of a registration statement for the 900,000 Adamas shares that were to be distributed to Scio shareholders.

49.      Suspicious trading in Scio stock occurred on November 28, 2019, two days prior to Scio signing the deal. Trading volume was almost 800,000 shares, well above the average volume of approximately 25,000-30,000 shares per day. The only persons who knew the deal was going to be signed were the Individual Defendants, other Scio officer and/or directors, Wavecrest, and Adamas. No other explanation for the unprecedented trading volume in Scio stock is plausible

other than it was the result of insider trading.

50.     On February 7, 2019, the Individual Defendants caused the Company to file a Form 8-K issued in connection with the proposed transaction with Adamas. The terms of the transaction had substantially changed to the detriment of the Company's public shareholders. The Form 8-K stated:

**Entry into a Material Definitive Agreement.**

The Company has entered into an Amended Asset Purchase Agreement, dated as of February 4, 2019, with Adamas One Corp., a Nevada corporation ("Adamas"), pursuant to which Adamas has agreed to purchase all of the assets of the Company in exchange for the following consideration:

1.  Satisfaction of all outstanding secured debt of the Company in the total amount of approximately $3.55 million over the eighteen (18) months following closing.

2.  Issuance to the Company of a total of 1,250,000 shares of Adamas common stock. 350,000 of such shares will be sold by the Company in a private sale within 20 days after Closing with a guaranteed minimum resale price for the Company of $2.00 per share, to be used to settle unsecured debt of the Company in excess of $3,000,000.

3.  The remaining 900,000 of Adamas common stock will be held by the Company for an undetermined time, in the discretion of the Board. The shares will be subject to a Registration Rights Agreement entered into between the Company and Adamas, and subject to lockup/leakout provisions which will allow their sale over a two year period following Closing, on a graduated basis.

4.  Assumption of certain limited liabilities of the Company.

This Amended Asset Purchase Agreement amends and supersedes the Asset Purchase Agreement entered into between the parties dated as of November 30, 2018, in its entirety. Consummation of the transaction is subject to satisfaction of numerous conditions, including, but not limited to, shareholder approval by the Company and other conditions. The Company will be providing additional information in connection with the shareholder meeting to be held to approve the transaction.

The Form 8-K was signed by Defendant McGuire.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

51.     The terms of the transaction had been changed dramatically. Instead of the 900,000 shares being distributed to shareholders and Adamas's obligation to have the shares registered with the SEC, the shares were to be "held by the Company for an undetermined time, in the discretion of the Board." The obligation of registering the shares with the SEC prior to consummation of the transaction had disappeared.

52.     That same day, the Company filed its Preliminary Proxy with the SEC reiterating the same terms as set forth in the Form 8-K. It also contained additional information about the Adamas Transaction. The Preliminary Proxy disclosed for the first time that the Individual Defendants were part of a group that had invested in secured debt of the Company and would be paid back in full (except for interest) as part of the cash consideration to be received in the Adamas Transaction. Further, the public shareholders were no longer going to receive a pro rata portion of the 900,000 Adamas shares which were mandated by the Agreement to be registered with the SEC prior to the Adamas Transaction being consummated.

53.     Now that the Adamas stock was no longer going to be distributed to shareholders or registered with the SEC, the terms concerning the registration of the 900,000 shares also changed. The Preliminary Proxy  represented that the registration of the 900,000 Adamas shares was to be done in stages if requested by Scio as follows: (i) Adamas to file registration statement for 300,000 shares 90 days after Scio's request; (ii) At Scio's request, Adamas to file a new registration statement to cover another 300,000 shares no less than 9 months after the first registration statement; and (iii) At Scio's request, Adamas to file a new registration statement to cover the remaining 300,000 shares no less than 15 months after the first registration statement. As to the Lock-Up/Leakout Provisions, up to 20% of the Adamas stock can be disposed of between months 9 and 18 after close; up to 50% of the Adamas stock can be disposed of between months

18 and 24 after close; and up to 100% of Adamas stock can be disposed of after month 24.

54.     Further, instead of liquidating the Company after the 900,000 shares were distributed as part of the Agreement, the Preliminary Proxy now disclosed that "[t]he Board intends to consider all options available to the Company regarding its future business, including engaging in active business activities."  The Preliminary Proxy also disclosed some shocking news for the first time that "[t]he Company currently conducts no active production operations, and has not conducted active production since October 2017." The vote for shareholder approval of the Adamas Transaction was set for March 8, 2019. No shareholder vote was conducted on March 8, 2019.

55.     On May, 17, 2019, the Company filed its final Proxy Statement. The shareholder vote was rescheduled for June 7, 2019. Included with the Proxy Statement was the representation that under Nevada law the Board had the right to remain private and independent if it determined that it was in the best interests weighing a number of different factors. It was further disclosed the identity of the officers and directors who held the secured debt, which includes all of the Individual Defendants. Thus, the only shareholders who were guaranteed cash compensation as part of the Adamas Transaction were Company insiders. The shareholders received nothing. The vote on the Adamas Transaction purportedly took place on June 7, 2019, and the shareholders approved the Adamas Transaction and it closed in August 2019. This information has never been publicly disclosed by the Individual Defendants nor have the Individual Defendants caused the Company to disclose it. Rather, it was disclosed in a lawsuit brought by counsel, Best & Flanagan LLP, retained by the Individual Defendants on behalf of the Company to represent the Company in the Adamas Transaction. That lawsuit was filed November 25, 2020, well over a year after the Adamas Transaction purportedly closed. None of this has material information has ever been widely

disseminated publicly or communicated to shareholders by the Individual Defendants or anyone else. Nor have the results of the shareholder vote on the Adamas Transaction ever been disclosed or any other information about the value of the 900,000 Adamas shares. In other words, Scio shareholders have been completely in the dark about the Company other than its last SEC filing in August 2019 of the SEC order revoking the registration of Scio's shares at the request of the Individual Defendants. In fact, after the Adamas Transaction had been publicly announced but prior to its closing, Adamas stated that the 900,000 shares needed to be priced at a minimum at $4.00 per share to be registered and publicly traded on an exchange and that would be no problem.

## **THE COMPANY HAS THE REGISTRATION OF ITS SECURITIES REVOKED**

56.     Beginning on June 29, 2016, the Company began missing the scheduled filing dates for its periodic reports, the Form 10-Qs and Form 10-Ks. On June 29, 2016, the Individual Defendants caused the Company to file Form 12b-25, Notification of Late Filing in connection with its Form 10-K for Fiscal Year ended March 31, 2016. The Company filed its Form 10-K late on July 14, 2016.

57.     The Company timely filed its Form 10-Q for the first quarter ending June 30, 2016, on August 15, 2016. It did not timely file its Form 10-Q for the second quarter ended September 30, 2016. On November 14, 2016, the Individual Defendants caused the Company to file a Form 12b-25, Notification of Late Filing in connection with its Form 10-Q for the second quarter ended September 30, 2016. It was subsequently untimely filed on November 23, 2016. The Company timely filed its Form 10-Q for the third quarter ended December 31, 2016, on February 14, 2017. This would be the last periodic report ever filed by the Company.

58.     The Individual Defendants filed Form 12b-5, Notification of Late Filing in connection with its: (i)  Form 10-K for Fiscal Year ended March 31, 2017 (filed Form 12b-25 on

June 30, 2017); (ii) Form 10-Q for first quarter ended June 30, 2017 (filed Form 12b-25 on August 14, 2017); (iii) Form 10-Q for second quarter ended September 30, 2017 (filed Form 12b-25 on November 15, 2017); and (iv) Form 10-Q for third quarter ended December 31, 2017 (filed Form 12b-25 on February 15, 2018). The Company never filed the periodic reports (or any subsequent periodic reports).

59.     On August 9, 2018, subsequent to the Adamas Transaction, the SEC issued an Order in *In the Matter of Scio Diamond Technology Corp.,* Administrative Proceeding File No. 3-19327, revoking registration of the Company's securities pursuant to its authority under Section 12(j) of the Exchange Act (the "Revocation Order'). The Revocation Order stated in pertinent part:

> On the basis of this Order and Respondent's Offer, the Commission finds that:
> A. Scio Diamond Technology Corp., a Nevada corporation based in Greenville, South Carolina (CIK No. 0001488934), purports to have developed technology to manufacture singlecrystal, lab-grown diamonds. The common stock of Scio has been registered under Section 12(g)2 of the Exchange Act since October 2011. It is currently quoted on OTC Link ("SCIO"), operated by OTC Markets Inc.
> B. Scio has failed to comply with Section 13(a) of the Exchange Act and Rules 13a-1 and 13a-13 thereunder, while its common stock was registered with the Commission in that it has not filed an Annual Report on Form 10-K since July 14, 2016 for the period ended March 31, 2016 or periodic or quarterly reports on Form 10-Q for any fiscal period subsequent to its fiscal quarter ending December 31, 2016. …
>
> In view of the foregoing, the Commission finds that it is necessary and appropriate for the protection of investors to impose the sanction specified in Respondent's Offer.
>
> Accordingly, it is hereby ORDERED, pursuant to Section 12(j) of the Exchange Act, that registration of each class of Respondent's securities registered pursuant to Section 12 of the Exchange Act be, and hereby is, revoked. The revocation is effective as of August 9, 2019.

60.     The Individual Defendants have never caused the Company to communicate with its shareholders to inform them that the registration of their Scio shares pursuant to the Exchange

Act had been revoked and the future plans of the Company now that the Company was no longer going to be publicly traded and basically had become a holding company for the 900,000 shares received in the Adamas Transaction. In fact, the order revoking the registration of the Company's stock was the last public filing or contact whatsoever with the Company's shareholders by the Individual Defendants, who had their secured debt paid off, at least in part, in the Adamas Transaction and have control of the 900,000 Adamas shares owned by Scio pursuant to the Amended Agreement.

## THE COMPANY GETS SUED BY ITS OWN LAW FIRM

61.     On November 25, 2020, the Company's former law firm sued the Company for failure to pay its legal fees, including those that incurred in connection with the Adamas Transaction. The case is docketed as *Best & Flanagan LLP v. Scio Diamond Technology Corporation,* Case No. 27-CV-20-15599 (Dist. Ct. 4th Jud. Dist. Minn).

62.     The *Best & Flanagan* Complaint alleges that the Company owed the law firm over $700,000 as of November 1, 2019, and that the parties had entered into a settlement agreement (the "Settlement Agreement") and a security agreement (the "Security Agreement") that same day.

63.     Under the Settlement Agreement, the Company agreed to pay $133,000 by November 25, 2019. The Security Agreement secured the payment and as part of the collateral securing the debt was the 900,000 shares of Adamas stock. According to the *Best & Flanagan* Complaint, on or about December 10, 2019, the Company paid $75,000, leaving a balance of $58,000, the amount requested by the lawsuit. The *Best & Flanagan* Complaint also alleged that the Adamas Transaction closed on August 29, 2019.

64.     The Company failed to answer or otherwise respond to the *Best & Flanagan* Complaint and a default judgment was entered against the Company. Ultimately, on or about June

25, 2021, the Company satisfied the judgment by paying the law firm the remaining balance of $58,000 and also attorneys' fees and interest making the total paid $63,455.50. None of this has ever been publicly disclosed by the Individual Defendants, the Company, nor anybody else to the Company's shareholders. The only place this information was found was in this obscure lawsuit brought in Minnesota state court. It has never been widely disseminated. Where the Individual Defendants got the funds to satisfy the default judgment against the Company is unknown since the funds were not paid until June 2021, almost two years after the Adamas Transaction purportedly closed. By that time, the only real asset the Company purportedly held was the 900,000 shares of Adamas stock.

**THE VALUE OF THE COMPANY'S 900,000 SHARES OF ADAMAS IS DILUTED BY THE EXEMPT OFFERING**

65.     On September 21, 2021, Adamas filed the Exempt Offering pursuant to SEC Rule 506(b). The Form D stated that $1,560,000 of Adamas stock had already been sold in the Exempt Offering and the total offering amount and/or remaining shares to be sold was "Indefinite". Adamas declined to disclose its revenue range and/or its aggregate net asset value range.

66.     The additional Adamas stock sold in the Exempt Offering diluted the value of the Company's 900,000 shares of Adamas stock. Had the Individual Defendants exercised their fiduciary duties and promptly exercised the Company's rights under the Amended Agreement and supporting documents, the 900,000 Adamas shares could have been sold in whole or in part, rather than have its value diluted by the Individual Defendants misconduct.

**DERIVATIVE ALLEGATIONS**

67.     Plaintiff brings this action derivatively in the right and for the benefit of Scio to redress injuries suffered, and to be suffered, by Scio as a direct result of breaches of fiduciary duty and other serious misconduct by the Individual Defendants.

68.     Scio is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

69.     Plaintiff will adequately and fairly represent the interests of Scio in enforcing and prosecuting its rights.

70.     Plaintiff has continuously been a stockholder of Scio at all times relevant to the wrongdoing complained of and is a current Scio stockholder.

## DEMAND FUTILITY ALLEGATIONS

71.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

72.      A pre-suit demand on the Board of Scio is futile and, therefore, excused.  Upon information and belief, at the time of filing of this action, the Board consists of the following four directors, all of whom are Individual Defendants: McPheely, Leaverton, Smoak and McGuire. Plaintiff only needs to adequately allege demand futility as to at least two of the four directors on the Board at the time this derivative action was commenced. Here, the entire Board is infected.

73.     Demand is excused as futile as to all four of the Individual Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their actions in (i) knowingly or recklessly failing to inform shareholders the results of the shareholder vote on the Adamas Transaction, shareholder approval of which was a prerequisite to consummation of the deal, (ii) failing to inform shareholders whether the Adamas Transaction ever closed, (iii) purportedly closing the transaction without any disclosure to shareholders, (iv) failing to disclose any information post-closing concerning the 900,000 shares of Adamas stock received as part of the Amended Agreement, (v) failing to inform shareholders how the Company's investment in the 900,000 shares of Adamas stock was performing, (vi) failing to inform shareholders whether the Individual Defendants ever requested Adamas take steps to register

31
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Adamas stock with the SEC as provided in the Amended Agreement and if they did not, the reasons for such a decision, (vii) failing to disclose whether the Individual Defendants' secured debt was ever satisfied; (viii) failing to disclose whether the unsecured debt was ever satisfied; (ix) failing to disclose any financial information to shareholders concerning Scio or Adamas post-closing of the Adamas Transaction, (x) having held no annual meeting as required by the Company's bylaws; (xi) knowingly and voluntarily having the Company's registration of its publicly traded shares with the SEC revoked; (xii) causing the Company's corporate status in Nevada to be revoked, (xiii) engaging in related party transactions by buying diamonds from the Company for their own use; (xiv) having made no attempt to contact shareholders after the Company's registration of its shares were revoked back in August 2019; (xv) causing the Company to have a default judgment entered against it and then paying over $60,000 to satisfy the default judgment without any disclosure to Company shareholders; and (xvi) failure to exercise its fiduciary duties by permitting the value of the 900,000 Adamas shares to be diluted by the Exempt Offering.

74.     The Individuals Defendants admittedly also engaged in related party transactions. According to the Proxy Statement, in May 2017 (just five months prior to ceasing operations), the Company initiated an Add-On Notes offering in which the Individual Defendants participated, collectively purchasing $165,000 of secured debt that ultimately was paid back, at least in part, in the Adamas Transaction. The Individual Defendants concede that "[t]hese individuals therefore have an interest in the ["Adamas"] [T]ransaction that is different from the average shareholder." This lack of independence also infects their ability to field a demand. In addition, McGuire is CEO of Adamas leaving no doubt about his lack of independence.

75.     As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is

futile, and accordingly excused.

76.     The Individual Defendants' conduct described herein and summarized above was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Individual Defendants can claim exculpation from their violations of duty pursuant to the Company's bylaws. As all four of the current members of the Board face a substantial likelihood of liability, they are self-interested in the actions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Thus, any demand upon the Individual Defendants would be futile.

77.     The acts complained of herein constitute violations of fiduciary duties owed by Scio officers and directors, and these acts are incapable of ratification.

78.     The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Scio. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain of the officers of Scio, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

79.     If there is no directors' and officers' liability insurance, then the Individual

Defendants will not cause Scio to sue the Individual Defendants named herein. If they did, they would face uninsured individual liability. Accordingly, demand is futile and excused.

80.     For the reasons noted above, none of the four current members of the Board could consider a demand with disinterestedness and independence. Accordingly, a demand on the Board is futile and excused.

<u>**COUNT I**</u>

**Against the Individual Defendants for Breach of Fiduciary Duties**

81.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

82.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Scio's business and affairs.

83.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

84.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Scio.

85.     The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

86.     The Individual Defendants had actual or constructive knowledge that they have failed to make several disclosures and failed to keep shareholders current on numerous items, caused the Company to have its shares deregistered, and caused the Company to have its

incorporation lapse, got sued by its former lawyers and a default judgment entered against it, and allowed the value of the 900,000 Adamas shares diluted by the Exempt Offering, all as set forth above. The Individual Defendants had actual knowledge of their wrongdoing, or acted with reckless disregard, in that they failed to disclose such facts to shareholders on behalf of the Company, even though such facts were available to them. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

87.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Scio has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

88.     Plaintiff on behalf of Scio has no adequate remedy at law.

## COUNT II

### Against Individual Defendants for Unjust Enrichment

89.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

90.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Scio.

91.     Plaintiff, as a shareholder and a representative of Scio, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from any insider sales, benefits, and payment of debt—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

92.     Plaintiff on behalf of Scio has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Scio, demands judgment as follows:

A. Declaring that Plaintiff may maintain this action on behalf of Scio and that Plaintiff is an adequate representative of the Company;

B. Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Scio;

C. Determining and awarding to Scio the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest;

D. Directing Scio and the Individual Defendants to take all necessary actions to maximize shareholder value by exercising the Company's right to request that Adamas have the 900,000 Adamas shares that the Company received in the Adamas transaction registered with the SEC.

    i. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

    ii. a provision to permit the stockholders of Scio to nominate at least five candidates for election to the Board; and

    iii. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

E. Awarding Scio restitution from the Individual Defendants, and each of them;

F. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court may deem just and proper.

1

2                                    **JURY DEMAND**

3           Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

4

5   Dated: February 10th, 2022              Respectfully submitted,

6
                                          _____/s/ Martin A Muckleroy_____
7                                           Martin A. Muckleroy
                                            State Bar #9634
8                                           **MUCKLEROY LUNT, LLC**
                                            6077 S. Fort Apache Rd., Ste 140
9                                           Las Vegas, NV 89148
                                            Telephone: 702-907-0097
10                                          Facsimile: 702-938-4065
                                            Email: martin@muckleroylunt.com
11

12

13                                          **EVANGELISTA WORLEY, LLC**
                                            James Evangelista
14                                          Stuart J. Guber
                                            500 Sugar Mill Rd, Bldg. A, Ste. 245
15                                          Atlanta, GA 30350
                                            Telephone: 404-205-8400
16                                          Facsimile: 404-205-8395
                                            jim@ewlawllc.com
17                                          stuart@ewlawllc.com

18

19

20

21

22

23

24

25

26

27

28

                                            37
                          VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT