# Exhibit A

Declaration of Martin A. Muckleroy

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| THEODORUS STROUS, in his capacity as a shareholder of SCIO DIAMOND TECHNOLOGY CORP. brings this action derivatively on behalf of SCIO DIAMOND TECHNOLOGY CORP., and as a Class Action on behalf of himself and all other Adamas shareholders who are similarly situated | Case No. 22-cv-00256-JCM-EJY |

Plaintiff,

v.

BERNARD MCPHEELY, KARL
LEAVERTON, GERALD MCGUIRE,
LEWIS SMOAK, ADAMAS ONE CORP.
and JOHN G. GRDINA

Defendants,

and

SCIO DIAMOND TECHNOLOGY CORP.,

Nominal Defendant.

**DECLARATION OF MARTIN A. MUCKLEROY, ESQ.**

**JURY TRIAL DEMANDED**

DECLARATION OF MARTIN A. MUCKLEROY, ESQ.

I, Martin A. Muckleroy, declare as follows:

1.      I am a partner with Muckleroy Lunt LLC, counsel on behalf of Plaintiffs,  and have personal knowledge of the facts set forth herein.  I make this Declaration in support of Plaintiff's Memorandum Of Law In Opposition To The Scio Individual Defendants' Motion To Dismiss.

2.      Attached hereto as the exhibit indicated is a true and correct copy of the following:

Exhibit 1 – Hearing transcript from *In re Puda Coal, Inc. S'holders Litig.*, C.A. No. 6476–CS (Del. Ch.  Feb. 6, 2013).

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed on May 15, 2023

*/s/ Martin A. Muckleroy*
Martin A. Muckleroy

1

# Exhibit 1

Transcript from *In re Puda Coal, Inc. S'holders Litig.*, C.A. No. 6476–CS (Del. Ch. Feb. 6, 2013)

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE PUDA COAL, INC.          :
STOCKHOLDERS LITIGATION        :
                               :   Consolidated
                               :   C.A. No.6476-CS


- - -

Chancery Courtroom No. 12A
New Castle County Courthouse
Wilmington, Delaware
Wednesday, February 6, 2013
10:00 a.m.


BEFORE:  HON. LEO E. STRINE, JR., Chancellor.


- - -


ORAL ARGUMENT AND THE COURT'S RULING


- - -

2

1   APPEARANCES:

2       NICHOLAS J. ROHRER, ESQ.
        Young Conaway Stargatt & Taylor, LLP
3            -and-
        GEORGE C. AGUILAR, ESQ.
4       of the California Bar
        Robbins Umeda LLP
5         Liaison Counsel for Plaintiffs

6       S. MARK HURD, ESQ.
        D. McKINLEY MEASLEY, ESQ.
7       Morris, Nichols, Arsht & Tunnell LLP
             -and-
8       RICHARD M. STRASSBERG, ESQ.
        MARY K. DULKA, ESQ.
9       of the New York Bar
        Goodwin Procter LLP
10        For Defendants Lawrence S. Wizel and
          C. Mark Tang
11                              - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

3

1          MR. ROHRER:  Good morning, Your Honor.

2   Nicholas Rohrer.  I wanted to introduce my co-counsel,

3   George Aguilar of the Robbins Umeda law firm who will

4   be making argument for plaintiffs.  Thank you.

5          THE COURT:  Good morning.

6          Good morning, Mr. Hurd.

7          MR. HURD:  Good morning, Your Honor.

8   Mark Hurd of Morris Nichols for defendants Wizel and

9   Tang.  I wanted to introduce to Your Honor Rich

10  Strassberg and Mary Dulka of Goodwin Procter.

11  Mr. Strassberg will be presenting argument on behalf

12  of our clients.

13          THE COURT:  Let's be to the point this

14  morning.  There are a few discrete issues, then we can

15  get to an answer.

16          Also, there's a motion for default

17  judgment; right?

18          MR. AGUILAR:  Yes, Your Honor.

19          THE COURT:  It's granted.  What you

20  need to prepare is an order.  I don't know what you

21  want in terms of relief.  I think what you need to be

22  thinking about is -- given what I understand all the

23  parties before the case say is basically a theft of

24  corporate assets, I don't know what we can do in the

CHANCERY COURT REPORTERS

4

1    United States to get them back.  But it would seem to

2    me a fairly strong judgment, which also allows you the

3    ability to get at any assets that the defendants have

4    placed in any channels of international commerce where

5    it's permissible to place liens against them or

6    transfer judgments to is in order.

7                    MR. AGUILAR:  Thank you.

8                    THE COURT:  Mr. Strassberg.

9                    Mr. Strassberg, I'm going to be

10   really -- your demand excusal theory is one I'm trying

11   to understand.  The three independent directors

12   resigned; right?

13                   MR. STRASSBERG:  Yes, they did, Your

14   Honor.  They resigned.  While the suit -- the suit

15   had --

16                   THE COURT:  The suit had already been

17   filed here.

18                   MR. STRASSBERG:  Yes, Your Honor.

19                   THE COURT:  They concluded the assets

20   had been stolen out from under them?

21                   MR. STRASSBERG:  Well, Your Honor, I

22   would say that the audit committee investigation that

23   they were compromising of did report back that it

24   appeared that Mr. Zhao had sold the assets.

CHANCERY COURT REPORTERS

5

1          THE COURT:   What I mean is, sold the

2   assets.   He didn't sell the assets and get

3   remuneration that was put in the corporate treasury.

4          MR. STRASSBERG:   No.   That's correct,

5   Your Honor.

6          THE COURT:   That's what I mean by -- I

7   used the '70s-school-playground-kid kind of thing,

8   "stolen out from under."

9          Then the three independent directors,

10  because of lack of cooperation, resigned.   Correct?

11          MR. STRASSBERG:   They did resign, Your

12  Honor.

13          THE COURT:   And they now stand before

14  the Court represented by excellent law firms saying

15  that demand is excused because, at the time this

16  complaint was filed, there were three independent

17  directors, and that would be a majority of the board

18  who could control what the company did.   After those

19  three directors concluded that it appeared that the

20  assets of the company had been stolen out from under

21  them, they did not cause the company to sue to recover

22  the assets using their control of the board.   They

23  quit, leaving the company in the hands of -- how many?

24  The two directors?

CHANCERY COURT REPORTERS

6

1            MR. STRASSBERG:  The first director,

2    Mr. Zhu, had resigned first in September.  So he had

3    left before any of the other independent directors had

4    resigned.

5            THE COURT:  This was a five-member

6    board.

7            MR. STRASSBERG:  Mr. Zhao would be the

8    remaining director.

9            THE COURT:  I thought there were five

10   directors.

11           MR. STRASSBERG:  There were two

12   implicated in the theft.

13           THE COURT:  So it left the two.

14           MR. STRASSBERG:  One of those two had

15   resigned earlier.

16           THE COURT:  So it left the principal

17   suspected wrongdoer in control of the company.  So as

18   I understand it, this is like you win because there's

19   cases that say you measure demand excusal by the board

20   in place when you filed the complaint.  Your clients,

21   by quitting, immunized themselves from suit while

22   simultaneously making it impossible for the company

23   itself to bring the suit.  I'm just wondering how, if

24   my state embraces this, we are not subject to totally

CHANCERY COURT REPORTERS

7

1    legitimate ridicule.

2              MR. STRASSBERG:  Your Honor, so let me

3    address that point directly.  I think your comments,

4    which go to the heart of the underlying activity by

5    Chairman Zhao reflect what appears to be a horrible

6    activity from him.

7              THE COURT:  No.  They go directly to

8    the argument that you and Mr. Hurd have made to me,

9    which is a demand excusal argument.  Mr. Strassberg, I

10   did not ask you and Mr. Hurd to make this argument.

11   You made it.  You did not bring just a 12(b)(6)

12   motion, you brought a demand excusal dismissal motion

13   seeking to impose upon the plaintiffs a higher burden

14   of pleading particularized facts on the grounds that

15   your clients -- and you don't represent the

16   independent director from China?

17             MR. STRASSBERG:  No.

18             THE COURT:  And the default judgment

19   motion has been against him, too?

20             MR. AGUILAR:  Yes, Your Honor.

21             THE COURT:  Well, I'm entering one.

22   You don't get to serve as a Delaware company and then

23   say, teeheehee, I'm not coming to Delaware on the

24   grounds that the three of them were independent

CHANCERY COURT REPORTERS

8

1    directors.  They're a board majority.  They could act

2    to take care of the company.

3                    Of course, the undisputed fact is,

4    after they concluded that it appeared that the assets

5    were stolen out from under them, they did not cause

6    the company to sue.  They quit.  Then they come to

7    court and seek to have the case dismissed.

8                    By the way, they're seeking to act on

9    behalf of the defaulting defendants.  Well, Mr. Hurd

10   looks quizzical.  If I dismiss the case on demand

11   excusal grounds, I can't enter a default judgment

12   against a wrongdoer, can I?

13                   MR. STRASSBERG:  Your Honor --

14                   THE COURT:  Can I?

15                   MR. STRASSBERG:  I'm not sure the

16   answer to that question.

17                   THE COURT:  Wait a minute.  Why are

18   you not sure?

19                   MR. STRASSBERG:  What --

20                   THE COURT:  A Delaware lawyer is

21   telling me, I think, if I dismiss the case on demand

22   excusal grounds, I dismissed it because control of the

23   lawsuit belongs to the company, therefore the decision

24   to sue the insiders who took the assets belongs to the

CHANCERY COURT REPORTERS

1  company.  The company might conclude that it's

2  perfectly okay to take the assets, or there's a cost

3  benefit analysis of suing and it's just not worth it.

4  I can't take on to myself in that situation.  I can't

5  enter a judgment at the instance of derivative

6  plaintiffs because control of a lawsuit belongs to the

7  board, which is now controlled by the guy who your

8  clients suspect stole the assets out from under them.

9            MR. STRASSBERG:  Your Honor, the

10  reason for the demand -- we hear Your Honor and we

11  believe that the 12(b)(6) motion is a meritorious one.

12  But the reason for the demand, as Your Honor has

13  asked -- as Your Honor knows better than anyone, the

14  reason for the demand requirement is to put these

15  decisions to the corporation at the time in May when

16  the case is filed.

17            THE COURT:  I understand what it is.

18  And there's also the idea: yes, at the time that you

19  do it, you should ask the corporation to act.  If at

20  the time motion practice occurs the people who are

21  claiming that they could act have concluded that the

22  entire corporate asset base has been sold out from

23  under the independent directors and what they decided

24  to do was to quit, for you, then, to say to the Court

1    that they could impartially consider a demand they

2    would have prior in time -- again, the law is supposed

3    to make common sense.  There's a measuring stick of,

4    yes, if they stayed in office and stuck to their guns,

5    then the measuring stick is when they sued because

6    they were the ones you should have gone and made the

7    demand to.  When, as a matter of undisputed reality,

8    when they were faced with knowing in their view that

9    there had been the most extreme sort of fiduciary

10    violation you could imagine, rather than have the

11    company sue, they quit, then come into court and seek

12    to use 23.1 and, frankly, disable the derivative

13    plaintiffs from even going after the bad guys.  When I

14    mean bad guys, I'm using your client's own view of

15    these people.  I'm trying to understand how my

16    state -- if I were to embrace this -- my state's

17    corporate law would not be justly subject to ridicule.

18              MR. STRASSBERG:  Judge, again, I don't

19    want to belabor.  I hear Your Honor and I respect Your

20    Honor's obviously views about this issue and I think

21    the motion and the plaintiffs' complaint is not

22    sufficient to sustain even the plaintiff friendly

23    standard under 12(b)(6).  But if Your Honor -- so I'm

24    happy -- if Your Honor would like me to --

1        THE COURT:  Do your clients speak

2   Chinese?

3        MR. STRASSBERG:  One of the two

4   clients does speak Chinese.

5        THE COURT:  One of them does.

6        MR. STRASSBERG:  But one of them does

7   not.

8        THE COURT:  These assets were sold out

9   from under him almost two years before they had any

10  inkling?

11       MR. STRASSBERG:  Eighteen months, Your

12  Honor, yes.  Your Honor, let me then turn, if I

13  might --

14       THE COURT:  I actually don't.

15       MR. STRASSBERG:  If you want me to

16  stay on it --

17       THE COURT:  Actually, I'm pretty hep.

18  I have a question for your friend about one of their

19  counts, otherwise I'm fine.

20       MR. STRASSBERG:  Okay.

21       THE COURT:  Thank you, Mr. Strassberg.

22       Mr. Aguilar, what is this unjust

23  enrichment count about?

24       MR. AGUILAR:  It's about the

CHANCERY COURT REPORTERS

12

1  compensation received by the individual defendants.

2           THE COURT:  I understand that theory,

3  having decided the Scrushy case.  As an innovator in

4  this field, I guess I would say the Scrushy case was

5  fairly unique in the sense -- what the Scrushy case

6  went to was the following.  There was a situation

7  where, as I recall, there was difficulty getting

8  testimony, or whatever, from Mr. Scrushy because he

9  was in hot water with the CR part of the law rather

10 than the part that starts with CI.  Some innovative

11 plaintiffs from -- one of the funny things is, you

12 know, some journals wrote about the law firm, the

13 obscure law firm that won Southern Peru.  And they

14 mention some Pennsylvania law firm when it was really

15 the Prickett firm.  Well, this was the Prickett firm

16 who won Scrushy, like they won Van Gorkom.  What they

17 came up with was the theory of unjust enrichment and

18 the argument was pretty simple.  There was a loan, or

19 something like that, where he had it and he paid it

20 back using equity at a time when the financial

21 statements of the companies were materially overstated

22 and had to be restated.  So the theory was, without

23 any kind of fault -- right? --irrespective of whether

24 he's at fault, it was unjust enrichment, because what

CHANCERY COURT REPORTERS

13

1   he was allowed to pay back with was worthless, if you

2   get my drift.  What I'm asking about here is, unjust

3   enrichment in this context, you plead nothing about

4   whether these guys got equity grants or option grants

5   or anything that was based on the financial

6   statements.  It all seems to be they were stingy, bad

7   directors, who didn't put in any effort, therefore

8   they shouldn't get paid.  To my mind, if it's the

9   latter theory, if that's really what you're about,

10  that's not a distinct cause of action.  That is, the

11  remedy for a breach of fiduciary duty should include

12  that.  And I saw nothing about whether there was, you

13  know, any tie to the amount of compensation they got

14  to the misstated financial statements.

15              MR. AGUILAR:  You're correct, Your

16  Honor.  It is our latter theory or how you expressed

17  it is our theory.  We do not have any evidence of

18  compensation tied to the value of the asset that was

19  taken.

20              THE COURT:  Okay.  Thank you.

21              I'm actually -- unless you have

22  something to comment on that part, Mr. Strassberg, I'm

23  good.

24              MR. STRASSBERG:  I don't, Your Honor.

CHANCERY COURT REPORTERS

14

1          THE COURT:  Okay.  I'm going to deny

2   the motion to dismiss, except in one minor respect.

3   I'll start with 23.1.  I did find this an astonishing

4   argument from these gentlemen, because it actually

5   could have fairly catastrophic consequences on the

6   ability of the derivative plaintiffs to go after

7   persons that they claim to be essentially thieves.

8   I'm kind of an old-school Delaware guy.  If there's a

9   demand excusal motion to dismiss that's granted, then

10  control of the entire lawsuit belongs to the board of

11  directors of the company, not to the derivative

12  plaintiffs.  It doesn't just dismiss the suit as to

13  the independent directors.  And that means I couldn't

14  have entered the default judgment that I entered

15  because the decision whether to bring an action

16  against those suspected wrongdoers would be in the

17  control of the board of directors, the sole member of

18  which is now the one who's alleged by the independent

19  directors to be the principal wrongdoer.

20          Why use the term ridicule?  I think

21  those of us who actually -- judges in Delaware who

22  participate in corporate law in Delaware take

23  legitimate umbrage when folks say that we don't hold

24  managers accountable for breaches of fiduciary duty in

CHANCERY COURT REPORTERS

15

1    Delaware.  I find that claim to be astonishingly

2    outdated and simple-minded, when any review of our

3    corporate law will see -- just out of our statutory

4    corporate law will say that is, frankly, much more pro

5    stockholder and more balanced than any of our other

6    states, most of which have stronger insulations

7    against director liability, many of which allow

8    directors in the context of takeovers to use takeover

9    defenses not permissible in Delaware, and when the

10   major controversies that have come out of Delaware

11   over the last 30 years, some of them have been about

12   things that are anti stockholder.  Many of them are

13   cases like Van Gorkom, Omnicare, Quickturn.  Guys like

14   me, El Paso, Southern Peru, Loral, where we've held

15   people accountable in big ways for things.  And we

16   take seriously in the derivative suit contest that,

17   frankly, you shouldn't lightly take away from the

18   board of directors the ability to control a lawsuit.

19   But to use doctrinal law in some sort of gotcha way is

20   just not appropriate.

21              The plain, simple reality here, as

22   admitted by the moving defendants, is the following.

23   When these plaintiffs sued, they were a majority of

24   the board.  So they claim they're independent with

1   their colleague from China.  They could have

2   controlled the lawsuit.  They investigate the very

3   things that are at the very bottom of the plaintiffs'

4   suit.  They conclude that what the plaintiffs are

5   complaining about they subjectively believe is true.

6   But they have been stonewalled.  In the face of

7   stonewalling and knowing that they could actually

8   cause the company to join the lawsuit and pursue

9   things, these directors quit.  They quit.  They leave

10  the company under the sole dominion of a person they

11  believe has pervasively breached his fiduciary duty of

12  loyalty.

13              Then, when faced with this lawsuit,

14  rather than simply defend it as to themselves on the

15  straight up 12(b)(6) ground, they use the shield of

16  23.1 and claim that because when they were in a board

17  majority at the time the lawsuit was done, the

18  plaintiffs can't go forward, even while telling the

19  Court that what they would do when they concluded

20  there was wrongdoing was not to bring suit but to quit

21  and leave the company in the control of a person that

22  they believed had seriously breached his fiduciary

23  duty of loyalty.

24              Now, I have read Kafka because I like

1   literature.  I think it would be drawing the wrong

2   lessons from Kafka for me to premise a dismissal of

3   this case on demand excusal grounds.  I think

4   Kafkaesque is the only way one could put that.  It

5   would be ridiculous and it would be wrong.  And I will

6   not -- do not believe our law requires such a

7   ridiculous result, and I am rejecting the demand

8   excusal argument.

9               On 12(b)(6), I am sorry.  Even if it's

10  just purely looked at as a Caremark case, drawing

11  reasonable, rational inferences in favor of the

12  plaintiffs, as I must, I believe the inference -- one

13  possible inference you can draw from this complaint is

14  that essentially somebody took hold of an American

15  vehicle, filled it with assets, sold a large amount of

16  stock to the American investing public that

17  independent directors were willing to go on and be a

18  vehicle and get payments without understanding the

19  duties they were taking on.  That if you're going to

20  have a company domiciled for purposes of its relations

21  with its investors in Delaware and the assets and

22  operations of that company are situated in China that,

23  in order for you to meet your obligation of good

24  faith, you better have your physical body in China an

18

1   awful lot.  You better have in place a system of

2   controls to make sure that you know that you actually

3   own the assets.  You better have the language skills

4   to navigate the environment in which the company is

5   operating.  You better have retained accountants and

6   lawyers who are fit to the task of maintaining a

7   system of controls over a public company.  When a

8   board of directors -- one of the things Caremark

9   people lose sight of, one of the things at the root of

10  Caremark, if you look at all the cases in the pattern,

11  there's also something that is a violation of law that

12  the company has been called out about.  Important.

13  Companies -- we should all try to be as law compliant

14  as we can.  I won't ask anybody about how compliant

15  they are with speed limits all the time.  Often you

16  can be at a company where it has a $25 billion market

17  cap and it's assessed a $45 million regulatory penalty

18  for one of its pharmaceutical units in the northwest

19  of the United States.  Right?  Directors are sitting

20  on top of a board of a $25 billion company.  That

21  proportionality comes into play in assessing Caremark

22  and the reasonableness of peoples' efforts at

23  compliance because you can't watch everybody

24  everywhere.  You have to have a system.  This is a

1  little bit distinct from your typical Caremark case.

2  Why?  Because the entire asset base of the company was

3  sold out from under the independent directors nearly

4  two years before they discovered it.  And did they

5  discover it?  No.  Apparently people who can blog

6  about things discovered it.

7           Now, it may go that these directors

8  toured the organizations every quarter and were

9  actually having quarterly board meetings in facilities

10 the companies no longer owned.  It might be that they

11 had their auditors in there.  They had change of

12 control.  It may be -- it may also be that they

13 basically met telephonically quarterly.  Never went to

14 China.  And I'm not going to dismiss it for anything.

15 There's a breach of fiduciary duty count.  I believe

16 that the magnitude of what happened here, the length

17 of time it went undiscovered, the repetitive filing of

18 statements saying that the company owned assets they

19 didn't, I do think it gives rise to a Caremark claim

20 in these circumstances, and it gives rise again to the

21 possibility that people allow themselves to be -- I

22 just taught last night in class the Francis case from

23 New Jersey, the old bank case about the insurance

24 brokerage case, the woman who was on the board and she

20

1   never read any financial statements for ten years.

2   Whatever.  And the Court said, "We didn't allow dummy

3   directors."  What they mean by that, we actually do

4   allow dummy directors.  You can be a dummy director.

5   You just have to be an active dummy director.

6                    You're actually dumb; right?  Strine

7   misses stuff.  If I'm trying and I miss stuff, you get

8   credit for that.  What you can't be is a dummy

9   director in the sense of an actual dummy.  Like

10  somebody, a mannequin, somebody who allows themselves

11  to be appointed to something without any serious

12  effort to fulfill the duties.

13                   Now we're at the motion to dismiss

14  stage.  That is the most plaintiff-friendly,

15  least-defendant-friendly context of the case.  But in

16  this situation, frankly -- and this is a troubling

17  thing for Delaware, and this court has taken very

18  seriously this -- the use of Delaware entities.  And I

19  forget whether this was a shell.  I suspect it was a

20  shell.  I suspect it was something that never went

21  public in this form in the United States.  It was

22  revived.  I take very seriously our integrity.  This

23  is a very troubling case in terms of that, the use of

24  a Delaware entity in something along these lines.

CHANCERY COURT REPORTERS

21

1   Independent directors who step into these situations

2   involving essentially the fiduciary oversight of

3   assets in other parts of the world have a duty not to

4   be dummy directors.  I'm not mixing up care in the

5   sense of negligence with loyalty here, in the sense of

6   your duty of loyalty.  I'm talking about the loyalty

7   issue of understanding that if the assets are in

8   Russia, if they're in Nigeria, if they're in the

9   Middle East, if they're in China, that you're not

10   going to be able to sit in your home in the U.S. and

11   do a conference call four times a year and discharge

12   your duty of loyalty.  That won't cut it.  That there

13   will be special challenges that deal with linguistic,

14   cultural and others in terms of the effort that you

15   have to put in to discharge your duty of loyalty.

16   There's no such thing as being a dummy director in

17   Delaware, a shill, someone who just puts themselves up

18   and represents to the investing public that they're a

19   monitor.  Because the only reason to have independent

20   directors -- remember, you don't pick them for their

21   industry expertise.  You pick them because of their

22   independence and their ability to monitor the people

23   who are managing the company.  And a lot of life -- I

24   would not serve on -- if I were in the private

CHANCERY COURT REPORTERS

22

1   sector -- not that anybody would want me -- but there

2   are a lot of companies on boards I would not serve

3   because the industry's too complex.  So if I can't

4   understand how the company makes money, that's a

5   danger.  If it's a situation where, frankly, all the

6   flow of information is in the language that I don't

7   understand, in a culture where there's, frankly, not

8   legal strictures or structures or ethical mores yet

9   that may be advanced to the level where I'm

10  comfortable?  It would be very difficult if I didn't

11  know the language, the tools.  You better be careful

12  there.  You have a duty to think.  You can't just go

13  on this and act like this was an S&L regulated by the

14  federal government in Iowa and you live in Iowa.

15              So on Caremark alone, I have no

16  problem saying that it passes muster under 12(b)(6).

17  Again, 12(b)(6) is different than 23.1.  One of the

18  things these directors tried to do was to impose a

19  particularized pleading burden.  It's not a

20  particularized pleading burden.  It's 12(b)(6).  It's

21  perfectly conceivable on these pled facts that there

22  wasn't a good faith effort to try to monitor.

23              There's also another thing that in my

24  view states a claim for breach of fiduciary duty,

1   which is the behavior of these directors once they

2   recognized what the insiders had done.

3                   I'm not sure that the Monty Python

4   response -- and I refer to the scene involving the

5   words "run away."  I don't believe that -- there are

6   some circumstances in which running away does not

7   immunize you.  It in fact involves a breach of duty.

8   And I think the extreme circumstances here might well

9   constitute one.  If these directors are going to

10  eventually testify that at the time that they quit

11  they believed that the chief executive officer of the

12  company had stolen the assets out from under the

13  company, and they did not cause the company to sue or

14  do anything, but they simply quit, I'm not sure that

15  that's a decision that itself is not a breach of

16  fiduciary duty.  And that's another reason for

17  sustaining the complaint.

18                  So the motion to dismiss the breach of

19  fiduciary duty counts is denied.

20                  I am going to dismiss the unjust

21  enrichment count for the following reasons that's pre

22  staged by my colloquy of both Mr. Aguilar.

23                  Having been the Judge who kind of

24  innovated a bit with the use of unjust enrichment in

1    the Scrushy case, I think that is a fairly narrow use.

2    Unjust enrichment is an equitable gap filler that

3    exists when there isn't another legal or equitable

4    cause of action.  The appropriate way to recover a

5    compensation paid to these directors, if it's on the

6    theory that they essentially didn't show up to work is

7    as an element -- that should be really part of the

8    damages that are assessed against them if the

9    plaintiffs prevail on their breach of fiduciary duty.

10   It's another thing if, as my colloquy with Mr. Aguilar

11   indicated, I think it would be another thing if they

12   got compensation that was measured by the false

13   financial statements.  That, I think, would be more

14   analogous to Scrushy, where you wouldn't necessarily

15   have to prove fault on their behalf.  They were simply

16   unjustly enriched, being the people who were --

17   approved the financial statements that were false and

18   were the basis for their excess compensation.  I think

19   you could get to something, and I wouldn't probably

20   dismiss.  You didn't engage on that point and I

21   applaud Mr. Aguilar's candor that that was not his

22   theory.  So I'm going to dismiss that count without

23   prejudice.  If there turns out to be some element of

24   compensation that is more tied to the statements, but

25

1    the present theory I don't expect to see again.

2              So why don't you all work on an

3    implementing order and we'll go from there.   That

4    includes obviously, as to the default judgment,

5    figuring out where to go.

6              I also encourage, in light of the

7    entry of the default judgment, in light of the

8    colloquy this morning, perhaps there should be some

9    discussions between the plaintiffs and the defendants.

10   And there might be more commonality of interests than

11   perhaps has been suspected.  I don't know.  It may be

12   just a little bit of an adjustment of the perspective,

13   of widening the lens of these fellows and a little bit

14   of counsel yourselves about what this dynamic

15   involves.  Because I think even your friends on the

16   plaintiffs' side would say your clients are

17   differently situated than the other defendants.  But

18   sometimes in acknowledgment -- it's like when people

19   talk about doctors and patients where something goes

20   wrong; right?  How far it goes with the patients

21   sometimes for the doctor to acknowledgment, but the

22   problem in the legal context is it's hard for people

23   to say they're sorry.  Where somebody says I'm sorry,

24   which means I'm sorry that the operation didn't turn

1   out as well, it doesn't mean I'm sorry, in the sense

2   I'm admitting that I committed professional

3   malpractice and therefore I owe you all my net worth.

4   Those conversations don't happen because when you're

5   in a legal context.  But the reality is that these

6   fellows were directors and the company was sold out

7   from under them.  It can't feel good.  In some way

8   that I'm not tied to any legal standard, they have got

9   to feel some sense of responsibility, probably, and it

10  might be working together to try to actually clamp

11  down in as big a way as possible on the wrongdoer,

12  together can be a mutually beneficial thing on a

13  kind -- all kinds of levels.  But that's really up to

14  you all.

15              For now, I'm just doing the things I

16  said.  So prepare an implementing order.  Think hard

17  about what should be in the default judgment.  I would

18  urge you all -- and, you know, I'd urge the plaintiffs

19  to not rush that one in.  The only thing -- what I

20  mean by that is, it's a fairly serious document in

21  terms of how it's going to be used, what you can do

22  with it.  The difficulties of collection or

23  enforcement I don't underestimate.  You know,

24  experience does tend to indicate that folks who end up

27

1    with tens of millions of dollars often place them in

2    more than one nation, and that sometimes they're

3    wiring money, doing other things, and you're able to

4    capture that in places other than their home country.

5                    I also, you know -- frankly, have no

6    understanding of whether there's the potential to get

7    something in China against them or not, but that

8    should obviously be explored.  And to the extent that

9    China wishes to facilitate in-bound investment, this

10   is exactly the thing I wouldn't be putting on a

11   marketing brochure.  There perhaps might be more

12   receptivity than folks might originally imagine to

13   being able to enforce a judgment in China.  I don't

14   know.  But what I'm saying is, it strikes me that, if

15   the principal purpose of this is to get recourse, it's

16   best to take a good patch of time seriously looking at

17   how the order should read and what you need from the

18   Court, and we can have a further hearing about that

19   when you're satisfied.

20                    So, thank you.  See you soon.

21                    (Court adjourned at 10:41 a.m.)

22

23

24

CHANCERY COURT REPORTERS

28

```
1                    CERTIFICATE
2              I, DIANE G. McGRELLIS, Official Court
3   Reporter of the Chancery Court, State of Delaware, do
4   hereby certify that the foregoing pages numbered 3
5   through 27 contain a true and correct transcription of
6   the proceedings as stenographically reported by me at
7   the hearing in the above cause before the Vice
8   Chancellor of the State of Delaware, on the date
9   therein indicated.
10             IN WITNESS WHEREOF I have hereunto set
11  my hand at Wilmington, this 7th day of February, 2013.
12
13             /s/ Diane G. McGrellis
               ----------------------------
14             Official Court Reporter
                of the Chancery Court
15                State of Delaware
16
17  Certification Number: 108-PS
    Expiration:  Permanent
18
19
20
21
22
23
24
```

CHANCERY COURT REPORTERS